IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

**FILED**
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

JUL 29 2019

JAMES W. McCORMACK, CLERK
By:_____ DEP CLERK

| | |
|---|---|
| KAMERON EVANS AND NOAH EVANS, | § § § |
| Plaintiffs | § § § |
| v. | § § § |
| CABOT SCHOOL DISTRICT, TONY THURMAN, AND HENRY HAWKINS, | § § § § § |
| Defendants | § § |

CIVIL ACTION NO.

*4:19cv525-KGB*

This case assigned to District Judge *Baker*
and to Magistrate Judge *Deere*

## COMPLAINT

Kameron Evans and Noah Evans for their Complaint state:

### Introduction

1.     Kameron Evans and Noah Evans were juniors at Cabot High School in the Cabot School District ("CSD") during the 2017-18 school year until they were arrested, charged with a crime, and recommended for expulsion in violation of their constitutional rights. In response to violations of their constitutional rights, Kameron and Noah's mother, Kerri Evans, withdrew them from CSD and began homeschooling them. They were eventually tried

and acquitted of the criminal charge. Kameron and Noah, having reached the age of majority, file suit on their own behalf seeking to recover damages for violations of their constitutional rights pursuant to Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d; 42 U.S.C. §§1981, 1983 and 1988.

2.      CSD is an Arkansas school district and a public corporation that may be sued in its own name. Ark. Code Ann. §6-13-102(a). Arkansas school districts are not state agencies immune from suit pursuant to the Eleventh Amendment. *Herts v. Smith*, 345 F.3d 581, 588 (8th Cir. 2003).

3.      Dr. Tony Thurman is and was at all relevant times CSD's Superintendent.

4.      Henry Hawkins is and was at all relevant times Principal of CSD High School.

## Jurisdiction and Venue

5.      This Court has jurisdiction over Plaintiffs' federal claims pursuant to 28 U.S.C. §1331 and §1343(a)(3). This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. §1367.

6.      This Court is the proper venue. *See* 28 U.S.C. §1391(b). Kameron and Noah reside in Lonoke County, Arkansas. The District is located in Lonoke County, Arkansas. The events giving rise to this Complaint occurred in Lonoke County, Arkansas. Lonoke County, Arkansas is in the Eastern District of Arkansas, Western Division. *See* 28 U.S.C. §83.

## Statement of Facts

**7.**     Kameron and Noah were born outside the U.S. and have brown skin,

and as a result, they were denied the privileges and immunities conferred

upon "white" students by the Defendants.

**8.**     CSD is a racially-identifiable "white" school district. *See, e.g., Keyes*

*v. Sch. Dist. No. 1, Denver, Colo.*, 413 U.S. 189, 202 (1973) ("[T]he

assignment of faculty and staff, on racially identifiable bases, have the clear

effect of earmarking schools according to their racial composition, and this,

in turn, together with the elements of student assignment and school

construction, may have a profound reciprocal effect on the racial

composition of residential neighborhoods within a metropolitan area,

thereby causing further racial concentration within the schools.").

**9.**     According to the Arkansas Department of Education ("ADE") Data

Center, CSD enrolled 10,472 students during the 2017-18 school year. Of

those, 9,075 (87 percent) were identified as "white."

**10.**     CSD neighbors the Jacksonville North Pulaski School District

("Jacksonville"). According to the ADE Data Center, Jacksonville enrolled

4,306 students during the 2017-18 school year. Of those, 1,503 (35 percent)

were identified as "white."

**11.**     According to the ADE Data Center, CSD employed 652 teachers during the 2017-18 school year. Of those, 638 (98 percent) were identified as "white." No CSD teacher was identified as "black" or "hispanic."

**12.**     Jacksonville employed 270 teachers during the 2017-18 school year. Of those, 216 (80 percent) were identified as "white" and 47 (17 percent) were identified as "black." If CSD employed the same percentage of "black" teachers as neighboring Jacksonville, it would employ 113 "black" teachers, rather than none.

**13.**     According to the ADE Data Center, CSD High School employed 149 teachers during the 2017-18 school year. Of those, 140 (94 percent) were identified as "white." No teacher at CSD High School was identified as "black" or "hispanic."

**14.**     Jacksonville High School employed 72 teachers during the 2017-18 school year. Of those, 55 (72 percent) were identified as "white" and 14 (19 percent) were identified as "black." If CSD High School employed the same percentage of "black" teachers as the neighboring Jacksonville High School, it would employ 29 "black" teachers, rather than none.

**15.**     During their time at CSD High School, Plaintiffs were bullied because they were not "white" and/or were born outside the U.S. They were also bullied for their actual and perceived beliefs that challenged "white" supremacy and sought the equal treatment of persons of color.

**16.**     This bullying was so severe, pervasive, and objectively offensive that it could be said to deprive them of access to the educational opportunities or benefits provided by CSD High School. Thurman and Hawkins had actual knowledge of the bullying and were deliberately indifferent thereto.

**17.**     Plaintiffs have always been perceived as different and suspicious and victimized by false information shared among students on social media. For example, during the eighth-grade, a "Flag Challenge" video circulated among students. As Plaintiffs recall, the video showed a slim person with brown skin (that looked nothing like Kameron) burning a flag. A rumor started on social media that the person in the video was Kameron. The CSD allowed a large, angry mob of students to gather and threaten Kameron requiring he run for what he felt like was his life. Kameron made it into the Principal's office and was not harmed, but he had to be escorted to class by a police officer for days afterward.

**18.**     No students were disciplined by CSD for threatening Kameron or spreading a malicious rumor about him. To the contrary, CSD allowed many of the same students to hold a "Patriot Rally" as a counter-protest in response to the "Flag Challenge" video.

**19.**     While Kameron was specifically targeted by the "Flag Challenge" rumor, Noah also suffered the consequences. Kameron and Noah are brothers with the same adoptive mother but *not* the same birth mother. Other

than their brown skin and black hair, they do not look alike. Even so, other students referred to them as "twins" and acted as if they could not tell them apart. At their criminal trial, Assistant Principal Adam Koehler could not tell them apart. Because of this "cross-race bias," ire directed at Kameron was sometimes directed at Noah.

**20.**     Kameron was and is smaller than Noah, and this explains, in part, why he was targeted for bullying more than Noah. Bullying occurs in the context of an imbalance of power whether physical, cultural, cognitive or socio-economic. Kameron, who had been diagnosed with autism, suffered an imbalance in all these areas. Kameron also suffered from poor self-esteem, difficulty forming friendships, and a passive personality, factors associated with becoming a victim of bullying.

**21.**     Since junior high school and through the 2017-18 school year, Plaintiffs endured bullying in the form repeated acts of harassment, humiliation and ridicule including repeated picking on them because they are different, sarcastic comments about appearance, race, ethnicity, perceived religious beliefs, and beliefs about the need for racial justice; intimidation including verbal and physical threats; and, defamation including spreading false rumors with the intent to cause harm.

**22.**     Since junior high school and through the 2017-18 school year, Plaintiffs endured name-calling because of their perceived race and/or

ethnicity. As they recall, they were called "nigger," "bla-sian" (combining "black" with "Asian"),  "jap," "chink," and "gook," among other things. They have been called "terrorists." They have been asked to show their "green card" and told "go back where you came from" and "you don't belong here." Other students would say to them "Allah Akbar," a phrase CSD students associated with Islamic extremist suicide bombers.

**23.** Since junior high and through the 2017-18 school year, Plaintiffs were also bullied about their inability to do anything about the bullying. Kameron in particular was ridiculed for being small and weak and told he had "skinny arms," was "not a real man," and was a "girl." After reporting bullying, he would be further ridiculed for being a "snitch" and "tattle-tale."

**24.** Kerri encouraged her sons to be strong and stand up for themselves and demanded that the CSD stop the bullying. During the 2017-18 school year, Kameron reported to Principal John Shiron that another student was terrorizing him daily by physically punching Kameron and ridiculing him for his inability to prevent the bullying. Shiron scheduled a meeting with the Kameron and the other student. When confronted, the other student denied bullying and claimed Kameron freely participated in friendly horseplay. As with past reports of bullying, Kameron was simply told to "stay away" from the bully, and the bully suffered no consequences.

**25.**     After years of bullying with no real help from the CSD, Kameron

heard the message of the Black Lives Matter movement ("BLM")

movement, and it resonated with him. BLM is an international activist

movement, originating in the African-American community, that campaigns

against violence and systemic racism towards black and brown people.

**26.**     In January of 2018, Kameron posted on social media that he supported

BLM and Colin Kaepernick's and other athletes' decisions to kneel during

the National Anthem. While Kameron's social medial posts usually received

no more than three or four comments (including Kerri's), these posts

received hundreds of comments including some that were profane, hateful,

harassing, and threatening. Around the same time, Kameron also began

wearing a BLM t-shirt to school.

**27.**     Kameron's public support for BLM and Kaepernick caused the

bullying to escalate, and he was again physically threatened by an angry

mob of students. It was only after Noah made clear that he intended to fight

to protect his brother than the mob relented. However, some students

remained determined to "get" Kameron. In a written statement, another

student described the situation as follows:

Kameron is known to make a lot of people riled up about stupid stuff
and tried to get stuff started about black lives matter (sic) on
facebook[.] Ive (sic) had to talk people out of hurting him for some of
the stuff he says[,] and its (sic) starting to get out of hand.

FOIA 2019-02-26, p. 6.

**28.**    Kameron and Kerri met with Hawkins in an effort to address the bullying and threats against Kameron following his expression of support for BLM and Kaepernick. During this meeting, Hawkins blamed Kameron for the bullying telling him that "you can't go around Cabot High School saying things like that," referring to his support for BLM and Kaepernick. Again, Kameron was told to stay away from the bullies, and the bullies suffered no consequences.

**29.**    Plaintiffs reported the racial bullying to appropriate persons with authority to take corrective measures including Thurman, Hawkins, and Assistant Principal Nicole Gatewood and provided them an opportunity to do remedy the bullying.

**30.**    Thurman, Hawkins and/or Gatewood were deliberately indifferent to Plaintiffs' reports of bullying. To the extent the Thurman and Hawkins took corrective measures on the reports of bullying, those measures were ineffective, but Thurman and Hawkins failed to take any additional or different measures to stop the bullying. Whenever Plaintiffs reported bullying, they would be told to "stay away" from the bully, and the bully would suffer no consequences.

**31.**    After Thurman, Hawkins and/or Gatewood repeatedly failed to discipline "white" students who bullied Plaintiffs, Plaintiffs stopped

reporting the bullying because it only emboldened the bullies and escalated the bullying.

**32.**     Plaintiffs were Cadets in the CSD High School Air Force Junior ROTC. "White" students reported Kameron's social medial posts to the ROTC sponsor, Doug Haven, to get Kameron in trouble. An angry Haven informed Kameron that kneeling during the National Anthem was prohibited by the Cadet Guide and that Kameron would be removed from the ROTC program if he *at any time* knelt during the National Anthem. In fact, the Cadet Guide provided Kameron when he became a Cadet only applied to Cadets while *in uniform*. Haven revised the Cadet Guide after learning of Kameron's social media posts and misrepresented the revised Cadet Guide as the one provided Kameron when he became a Cadet. Nevertheless, Kameron abstained from kneeling during the National Anthem so he would not be removed from ROTC. The CSD took no action against Haven for his dishonesty in his dealings with Kameron.

**33.**     While BLM opposes violence, many "white" students and CSD employees viewed BLM as an extremist, terrorist organization. Referring to BLM, Haven described Kameron as having "a history of extreme positions or expressions." FOIA 2019-02-26, p. 13.

**34.**     On 13 February 2018, both Kameron and Noah wore military-style pocketed vests to school. Plaintiffs liked the vests because they looked cool

and the pockets were good for carrying their school supplies. The pocketed vests did not violate CSD's dress code. Earlier in the school year, a "white" student wore a full military uniform, including a bullet-proof vest, to school on a dress-up day, and he was not disciplined in any way. As a result, Plaintiffs had no reason to believe wearing military-style pocketed vests to school would cause any disruption at school, and in fact, it did not cause any disruption.

**35.**   Even so, "white" students reported Kameron was wearing the pocketed vest in an effort to get Kameron in trouble. Kameron was removed from class and interrogated. He explained he was just wearing the vest because he like the pockets. Kameron consented to a search of his duffle bag, and no contraband was found. Kameron was polite, respectful, and cooperative throughout his search and interrogation. A Cabot police officer acknowledged during the search and interrogation that he knew Kameron and knew that he is no threat. Even so, rather than simply telling Kameron to take off the vest and put it in his bag, Hawkins had Kameron arrested for "disorderly conduct," suspended him for 10 days and recommended him for expulsion. Thurman accepted Hawkins recommendation and ratified Hawkins decision to have Kameron arrested. Kameron was walked out of CSD High School in hand-cuffs and taken to the Cabot Police Department.

**36.**   Kerri Evans, Plaintiffs' mother, went to the Cabot Police Department to get Kameron. Noting the absurdity of Kameron's arrest, Kerri pointed out that Noah was still at school wearing a nearly identical vest. However, before Kerri could get to Cabot High School and get the vest from Noah, the District removed Noah from class and had him arrested. As with Kameron, Hawkins had Noah arrested for "disorderly conduct," suspended him for 10 days and recommended him for expulsion. Thurman accepted Hawkins recommendation and ratified Hawkins decision to have Noah arrested.

**37.**   Plaintiffs had no significant discipline history while CSD students. Moreover, on 14 February 2018, the CSD used a "Violence Assessment Tool" to assess the risk that Plaintiffs presented. CSD's "Violence Assessment Tool" indicated that Plaintiffs presented no immediate risk. According to the Violence Assessment Tool, a school district should take immediate action if a student scores at least 90 points out of a possible 250. Kameron's score was 15.70, and Noah's score was 12.86. FOIA 2019-02-26, pp. 14, 30.

**38.**   Plaintiffs wearing of pocketed vests caused no actual disruption at school, and Thurman and Hawkins did not reasonably believe that any disruption would result. In fact, Noah wore his vest uncovered until he was arrested at 11:38 a.m. (2.5 hours after Kameron), and no student or teacher

reported that Noah was causing or might cause a disruption. In this respect,

Noah is a similarly-situated comparator for Kameron.

**39.**    Thurman and Hawkins were aware of Kameron's support for BLM

and Kaepernick, and this was a motivating factor in their decision to make

an example of Kameron and Noah and have them arrested. Thurman

described Kameron as "the bullet proof vest/kneeling ROTC kid that is now

homeschooling" in an email to Hawkins and others dated 14 May 2018.

FOIA 2019-02-26, p. 160.

**40.**    Plaintiffs had a clearly established constitutional right to support BLM

and Kaepernick and reasonable school officials knew that they could not be

punished for expressing these views. *See Lowry ex rel. Crow v. Watson

Chapel Sch. Dist.*, 540 F.3d 752, 757 (8th Cir. 2008).

**41.**    Noah had a clearly established constitutional right not to be punished

because of his relationship with Kameron. *See Wagner v. Jones*, 664 F.3d

259, 274 (8th Cir. 2011).

**42.**    Thurman contacted Kerri to schedule a meeting about the expulsion

recommendation. Thurman suggested it would be a short meeting and

afterward Kameron and Noah would be returned to school. Later, a CSD

employee called Kerri and told her additional information had been obtained

but would not tell he what that information was. At the meeting, Thurman

informed Kerri that another student had reported a text from Kameron

stating, "I'm going to kill somebody." Kerry explained that Kameron sent this text in frustration and was venting, but he had no specific intent of hurting anybody. Even so, Thurman decided to assign Kameron to the CSD's alternative learning environment ("ALE"), while Noah would be allowed to return to school.

**43.**    Kerri informed CSD that she would homeschool Plaintiffs and withdrew them from CSD concluding that Plaintiffs were not safe in the CSD because Thurman and/or Hawkins were deliberately indifferent to them being bullied and might have them arrested for no reason (again).

**44.**    The arrest and criminal charge was particularly distressing for Noah because of he is not a U.S. citizen. Kerri and Noah feared a criminal conviction might result in Noah being deported back to his native Cambodia, even though he has been in the United States so long that he no longer speaks Cambodian. The arrest and criminal charge caused Noah to suffer a severe bout of depression with associated fear and anxiety.

**45.**    Plaintiffs were eventually tried and acquitted on the charge of disorderly conduct.

**46.**    Kerri had a natural born "white" son that was a senior at Cabot High School during the 2017-18 school year. Kerri's "white" son was treated very differently from Plaintiffs despite having a significant history of discipline problems.

**47.**     Thurman and/or Hawkins gave Kerri's "white" son break after break and refused to hold him accountable for misconduct, despite Kerri's pleas that they do so. For example, Hawkins called Kerri to report her "white" son was removed from class because he smelled like marijuana. Hawkins told Kerri there was nothing he could do because he had no contraband in his possession and his car was parked off-campus. Kerri suggested calling the police to have his car searched. Hawkins told her he could not do that. As a result, Kerri's "white" son was not disciplined. Kerri's "white" son was also skipping classes and not being held accountable. At one point, he was told he would have to attend Saturday school to make-up work or he would fail a history class; however, he inexplicitly passed history class even though he did not attend Saturday school.

**48.**     In contrast, Plaintiff's had no significant discipline history, but as soon as Thurman and/or Hawkins had a chance, they called the police on Plaintiffs' and had them arrested for wearing a pocketed vest to school that did *not* violate the District's dress code and did not cause any actual disruption.

## Count I: Title IV Student Bullying

**49.**     Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, states that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of,

or be subjected to discrimination under any program or activity receiving
Federal financial assistance."

**50.**    CSD is a program or activity receiving federal financial assistance.

**51.**    As describe above, the bullying of Kameron and Noah was so severe,
pervasive, and objectively offensive that it could be said to deprive them of
access to the educational opportunities or benefits provided by the school;
Defendants had actual knowledge of the bullying; and Defendants were
deliberately indifferent to the bullying.

**52.**    As a direct and proximate result of the bullying, Plaintiffs have
incurred and will incur in the future pecuniary and non-pecuniary losses for
which they should be compensated.

## Count II – §1983 First Amendment Retaliation

**53.**    The Civil Rights Act of 1871, as amended, 42 U.S.C. §1983 provides,
"Every person who, under color of any statute, ordinance, regulation,
custom, or usage, of any State or Territory or the District of Columbia,
subjects, or causes to be subjected, any citizen of the United States or other
person within the jurisdiction thereof to the deprivation of any rights,
privileges, or immunities secured by the Constitution and laws, shall be
liable to the party injured in an action at law, suit in equity, or other proper
proceeding for redress . . . ."

**54.** As described above, Thurman and Hawkins violated Plaintiffs' right to free speech in violation of the First and Fourteenth Amendments to the Constitution by punishing them for expressing their opinions and for wearing clothing to school that did not violate CSD's dress code, that caused no actual disruption and that no reasonable school official would believe was likely to cause disruption.

**55.** At all relevant times, Thurman and Hawkins acted under color of state law.

**56.** Plaintiffs' free speech was a substantial and motivating factor in Thurman's and Hawkins' decision to have Plaintiffs arrested and charged with a crime and to suspend Plaintiffs and recommend Plaintiffs for expulsion.

**57.** Alternatively, Noah's relationship with Kameron was a substantial and motivating factor in the decision of Thurman and Hawkins to suspend Noah, recommend Noah for expulsion and to assign Noah to the ALE in violation of First Amendment right to be free of political discrimination.

58. As a direct and proximate result of the First Amendment retaliation, Plaintiffs have incurred and will incur in the future pecuniary and non-pecuniary losses for which they should be compensated.

### Count IV -- §§1981, 1983 Racial Discrimination

59.    The Civil Rights Act of 1866, as amended, 42 U.S.C. §1981(a),

provides, "All persons within the jurisdiction of the United States shall have

the same right in every State and Territory to make and enforce contracts, to

sue, be parties, give evidence, and to the full and equal benefit of all laws

and proceedings for the security of persons and property as is enjoyed by

white citizens, and shall be subject to like punishment, pains, penalties,

taxes, licenses, and exactions of every kind, and to no other."

60.    Plaintiffs are members of a protected class in that they are not "white"

persons.

61.    As described above, Thurman and Hawkins intentionally

discriminated against Plaintiffs because they were not "white" persons, as

evidenced by the different treatment of a similarly situated "white" students.

62.    As described above, Thurman and Hawkins' intentional racial

discrimination interfered with Plaintiffs right to "the full and equal benefit of

all laws" and to be "subject to like punishment." 42 U.S.C. §1981(a).

63.    At all relevant times, Thurman and Hawkins acted under color of state

law.

64.    As a direct and proximate result of racial discrimination, Plaintiffs

have incurred and will incur in the future pecuniary and non-pecuniary

losses for which they should be compensated.

## Count IV: §1983 Equal Protection

65.     The Equal Protection Clause of the Fourteenth Amendment provides,

"No State shall make or enforce any law which shall abridge the privileges

or immunities of citizens of the United States; nor shall any State deprive

any person of life, liberty, or property, without due process of law; nor deny

to any person within its jurisdiction the equal protection of the laws."

66.     As described above, Thurman and Hawkins intentionally

discriminated against Plaintiffs because they are not "white," as evidenced

by the different treatment of a similarly situated "white" students.

67.     At all relevant times, Thurman and Hawkins acted under color of state

law.

68.     As a direct and proximate result of the denial of equal protection of

the laws, Plaintiffs have incurred and will incur in the future pecuniary and

non-pecuniary losses for which they should be compensated.

## Count V: Malicious Prosecution

69.     As described above, Thurman and Hawkins acted with an improper or

sinister motive when they initiated and continued the prosecution of

Plaintiffs for disorderly conduct.

70.     Thurman and Hawkins did not have probable cause for initiating and/

or continuing the prosecution of Plaintiffs for disorderly conduct.

71.     Thurman and Hawkins were aware of no facts or credible information that would induce a person of ordinary caution to believe that Plaintiffs were guilty of disorderly conduct.

72.     CSD is vicariously liable under the doctrine of respondent superior for Thurman and Hawkins' unlawful conduct because it was committed within the scope of their employment and they acted for the benefit of CSD.

73.     The criminal prosecution of Plaintiffs was terminated in Plaintiffs' favor.

74.     As a direct and proximate result of the malicious prosecution, Plaintiffs have incurred and will incur in the future pecuniary and non-pecuniary losses for which they should be compensated.

### Count VI: Abuse of Process

75.     As described above, Thurman and Hawkins set in motion legal proceedings against Plaintiffs to accomplish an ulterior purpose (racial discrimination; First Amendment retaliation; to make an example of Plaintiffs and/or to remove them from CSD High School) for which it was not designed.

76.     Thurman and Hawkins willfully used the criminal process in a manner not proper in the regular conduct of the proceeding.

77.     CSD is vicariously liable under the doctrine of respondent superior for Thurman and Hawkins' unlawful conduct because it was committed within the scope of their employment and they acted for the benefit of CSD.

78.     The criminal prosecution of Plaintiffs was terminated in Plaintiffs' favor.

79.     As a direct and proximate result of the abuse of process, Plaintiffs have incurred and will incur in the future pecuniary and non-pecuniary losses for which they should be compensated.

## **Punitive Damages**

80.     In addition to compensatory damages, Thurman and Hawkins should be ordered to pay Plaintiffs punitive damages because their conduct described above was motivated by evil motive or intent or reckless or callous indifference to Plaintiff's constitutional rights. *See Williams v. Brimeyer*, 116 F.3d. 351, 354 (8th Cir. 1997).

## **Jury Demand**

81.     Plaintiffs demand a trial by jury.

WHEREFORE, Plaintiffs pray that they awarded compensatory damages for their pecuniary and non-pecuniary losses and punitive damages in an amount determined by a jury; that they be awarded their costs and attorneys' fees expended herein; and, that they be awarded all other just and proper relief to which they may be entitled.

Respectfully submitted,

Theresa L. Caldwell (Ark. Bar No. 91163)
CALDWELL LAW OFFICE
14 Alban Lane
Little Rock, AR 72223
501-414-0434
Fax: 501-325-1502
tlcatty@gmail.com

*Attorney for Kameron and Noah Evans*